Good morning, Your Honors. May it please the Court, I'm Blair Dukas for the Plankton-Pellet Western Watersheds Project. Our case today is about the greater sage-grouse, one of the most beautiful birds in the West. This photo was taken by a friend of mine who's a professional photographer on Easter morning at sunrise, and it gives you an example of the kind of resource we're talking about today. We know a lot about the greater sage-grouse, and these sage-grouse cases are at least one of them. I appreciate that transparency, and I appreciate your prior rulings, and I do think that at least in this instance, as I understood, BLM is purporting to try and help with the greater sage-grouse, right? I mean, their position is that this whole project is about restoring the environment for various purposes, including, in the long run, to help the greater sage-grouse. That is what they say. If you compare their decision with the science that, for instance, the EA here and the FONSI acknowledged the 2010 finding by the U.S. Fish and Wildlife Service that greater sage-grouse warrants Endangered Species Act testing, because the science that is reflected in there completely contradicts what they say in their decision here. That's not what we have before us right now. It's neither threatened nor endangered, nor a special study set, right? Your Honor, at the time this decision was done, in 2012, the status was warranted for Endangered Species Act testing, precluded by other priorities, but what I'm trying to say is, in our appendix to our brief, is that 2010 set of findings from the U.S. Fish and Wildlife Service that refused the science. Now, the EA here acknowledges that and never discusses science. Do you think there are contradictory reports that have been made with regard to that? No, I don't think so, Your Honor. Contradictory scientific analysis? Not at all. In the U.S. Fish and Wildlife Service, the expert agencies have pulled together all the science. Now, in 2015, they said it's not warranted. That's because the federal agencies, BLM and Forest Service, went through an integrated planning process across the entire West and adopted new resource management plans to protect greater sage-grouse. There's all kinds of more measures in place now, but if you look at all you do is... It's actually not the management plan, but it's tier two in this case. Exactly. That management plan has now been amended with more sage-grouse protections, and there's new tools that are described as well in the 2015 finding, which the federal defense cited for one of their briefs. It says they have new tools such as a fire and large-scale landscapes, and how do you protect them from invasive species and fire? And again, the 2010 warranted... Question. What is the status of this project? My understanding, Judge, is nothing has been done except for maybe a couple of modest fence improvements or replacements. I think there was agreement between counsel during the entire administrative process and district court proceedings that if they were to move forward with the project, they would let us know and we could seek injunctive relief. We've not had any indication they've moved forward. Well, but similarly, if they're going to go forward with the project now, they're going to go forward with it in conformity with whatever the rules are now. Well, that's the point. They would be approving it based on what they said in 2012, even though it's now 2017 and we have amended resource management plans, we have a lot more science, we have a lot more tools in place. But the plan doesn't say how they're going to, you know, what kind of fires they're going to use, what kind of, in other words, the actual details still going to be governed by whatever the supervision requirements are now. I don't think so, Judge. I think that if they move forward now with a record of secrecy, as Fonzie had done in 2012, they're going to do it based on that. Fonzie, as I understand it, he doesn't get into the weeds in terms of, I don't know, he doesn't show us behind the scenes, but, in other words, it doesn't deal with how are you, what mechanical process are they going to use, what pesticides are they going to use, or exactly are you going to use pesticides, and how are you going to do the fire, and are you going to do fire here as opposed to there. It's not at that level of detail, right? If you're talking about the ELE resource management plan in 2009, you're correct. This decision has detailed descriptions of the treatments. They identify the acreage and what they're going to do. They're going to disc it. They're going to harrow it. They're going to put this herbicide on various places. There's 21 different projects. They've identified the specific herbicide that they would use. It's very poisonous to sagebrush. And my point is they are deliberately destroying sagebrush when the science says keep the sagebrush. And you see terms in the EEODA like decadent sagebrush. That is not what scientists say. Scientists say... We have a procedural issue for us, correct? You're arguing the science about whether this is a smart thing to do or not a smart thing to do, but those scientific decisions, we're not reviewing, correct? You're reviewing them to make sure they're reasonable and rational and based on the record. My point is the record does not have a discussion with scientists. You're looking at whether their environmental analysis was sufficient to take a hard look at direct, indirect, and cumulative impacts. And on the cumulative impacts, we have these other projects that have happened in 2008 exactly like this, a bit smaller, but right in the cumulative impacts area, deliberately targeting sagebrush for destruction. They're destroying sagebrush out there to claim that they're improving. They say in the long term it will. And that's why I'm saying the 2010 finding from Fish and Wildlife Service makes very clear these kinds of treatment projects are not positive for sage grouse. They're not positive for sagebrush. They say that very expressly. For instance, at A, the Appendix 85, restoration techniques are considered mostly unproven and experimental. Once you send this heavy equipment out, the tractors pulling a chain or the harrowing, it disturbs all the soils, the sensitive soils, and that allows cheatgrass to come in. They're going to destroy sagebrush, allow cheatgrass to come in. They say it's good for sagegrouse, but there is no analysis there. There's no analysis of what happened in these two 2008 projects. It hasn't been enough time, correct? No, of course it hasn't. They suggested that it took a quarter, five year period of time before you would see results. So they didn't have time to make that decision. That's not correct, Your Honor. These sage, specifically in those prior projects, they would do annual monitoring. You can go out and see our small sagebrush coming out. You can do various measurements. You have a full sagebrush, it's not back, but the district court itself found the prior Lincoln County, Lincoln Valley treatment reduced thousands of acres to dust. These areas are not going to come back. That was the point in the beginning. It does reduce into dust, and then it comes back.  That's not what the district court said. The science says otherwise. The science says if you disturb the soils, you take out the native vegetation. There's no disagreement, but again, you're talking science, not procedure. I'm talking about science from the federal government that's actually cited in their EA, but not discussed. It's the kind of adverse impact that EPA is supposed to discuss and disclose, not sweep under the table. There is no analysis of how this is going to work. They say we expect it to improve, but there's no analysis. If you look at the EISs they're tiering to, the EER and the vegetation treatment one, they have no discussion of how this process would work. They have no site-specific information about what it means in these areas for sagebrush. Sagebrush populations are falling apart, and they need to stay connected. If you go out and destroy more sagebrush, what does it do to those populations? There's no analysis of that in the EA. They most certainly did not take a hard look, and it's most clearly reflected in the cumulative effects analysis. It's very summary and assertive. It has no actual analysis or data about the prior projects. That's the kind of thing this board has said over and over and over again. Why are they so neat about it? They said they were going to collect it every year after they did these two prior projects, and now they say they haven't done it. This is the problem with NEPA. They say they'll do something, but then they don't do it. The court has to make sure they take a hard look now and report what's actually happened out there, rather than say we would do one thing and then not. The two 2008 projects destroyed something like 12,000 acres of sagebrush. What did that do? And those were all targeted within five miles of Rocksville. It's okay that they had these two much smaller projects, and they weren't much longer. They're not much smaller. 12,000 acres. Well, that's the size. That's definitely the size, exactly. That's much smaller. I mean, whether that matters or not is another question, but it was much smaller. But your point is, and it's not interesting, that the generic, what's the RFP for that area, said there was supposed to have been two sites. Exactly. And those plants said there was supposed to monitor, and they didn't monitor. Correct. So, when this thing came up, they, so what specifically should they have done that they didn't do? They should have acknowledged the scientific process by which these ecosystems are affected, and if you start destroying the sagebrush by poisoning it, you think, well, what is this? So, statistically, I mean, what should have been either done on the ground or put in the EA that would have satisfied the cumulative effects? They should have discussed exactly what had happened with their prior treatments. Where will the current treatments affect sagebrush, and how does that affect the populations of sagebrush? There's no description at all about what's going on with sagebrush populations. There's no numbers about, are they up, are they down? But all of that information is out there. These federal agencies have been spending a lot of time on sagebrush. They know the science. They know what they're supposed to do. They have all these new tools now to do it, and they actually didn't address all of that stuff that was known to the federal scientists. I would like to bring to the court's attention the December 2016 case. So, one, it is in the EA about sagebrush, specifically, and there's a heading 3.6, Greater Sagebrush, and then they go on about it, describing it. The problem is that it's not, is your problem that it's not numerical? It's a very generic general description that's in the EA, pages 77 to 79, about the greater sage-grouse. They do mention that these are priority habitats, which are supposed to be conserved at all costs. There is a generic flex, and so on, but your problem is that they don't analyze the whole process. Do the sage-grouses. They don't analyze any of the information, scientific information, that's out there about what's affecting sagebrush. What's the accuracy of the record? Where is the scientific information? It's in, for instance, the 2010 warranted precluded finding that is referenced in the EA in this case. I'm down to three minutes, ma'am. Sorry. I have a couple of these plans, discussions about mitigation measures, which are important to this cumulative impact theory. In other words, they, if there's just one, and 2.3, they talk about not allowing treatments within four miles back to fleece. Lex. Lex, I'm sorry. So, I mean, part of that is that they do document mitigation measures that they're taking, and isn't that important to this cumulative impact theory? And that's part of my point, is the prior projects were targeting within five miles of Lex. Now, they're saying, well, stay outside of them. So, they're actually hitting both the black areas and outside of it. Another of the measures they say is we won't get more than 20 percent of disturbance over a 30-year period. Within an area, but how do they know? Because they haven't calculated that yet. I'm going to pass it to you, Mr. Roboto. Thank you. Please support my name is Robert Oakley, and I'm here on behalf of the Bureau of Land Management, and I'd like to start out by correcting the number of statements that were made, but particularly what the science, in quickly short, says. Actually, there's a lot of agreement, if you look at the briefs, as to the condition of the landscape in these areas. It's bad. The plan is, quote, in pages 11 through 13, from BLM, and from my own information, about the plan, it's explained why fire is very bad for the sage-grouse. It destroys flecks. It might not come back big-legged for 125 years. They also talk about problems with invasive weeds, and because of past fire suppression efforts, you have these trees that are there that destroy the grasses and forbs the sage-grouse that came from their habitat. So, they agree. The situation is bad. Now, what the science does not say, and an argument they did not make in their opening or reply brief, is that this problem will solve itself, but does it won't? The problem with invasive weeds is that they out-breed and out-produce the native vegetation. Fire risk will reduce itself only by having an uncontrolled wildfire if we don't take steps to deal with it. Now, for whatever concerns Council might have with mitigation measures in terms of keeping prescribed fires away from flecks, if there's a wildfire, there's going to be no mitigation there. Nobody's going to—they're going to be trying to put the fire out, but it will not happen in a controlled situation. So, they concede in their briefs, and I want to be clear on this. They never make the argument, this is going to get better. Wait, Governor, this— No, that's true, but the question—as I said when I began, we understand that the intent here is to make things better, not worse. But that doesn't absolve the agency from taking the hard look, particularly with regard to cumulative impacts. And so, the question is, did that happen? Particularly, I mean, the things that—a few things that concern me. One is that it does seem to me that the CAA was pretty bare bones in the sense that it is descriptive as to what's out there now, but not terribly analytical as to why whatever is going to be done is actually going to—it says it's going to make things worse in the short run, but better in the long run, but in a conclusory fashion. So, the question is, was more needed with regard to the negative short-term impacts and how they could accumulate and whether that matters, whether there's some point at which the negative short-term impacts become negative long-term impacts. And the reason that the EA satisfies is— I'm sorry, what? I'm sorry.  In the end, the other project EISs say that there has to be site-specific investigation. The question is, was there an adequate site-specific investigation? Well, for the current situation, I mean, the—descriptively, describing how many sage grouse were out there is a pretty—it's a very big range that it's described, but it's an ABA. So, now we have an assemblage that actually went out there and looked. Is there— Oh. It says something like 5 to 24 sage grouse. That's a big number, a big difference. Well, the—okay, just going to the sage grouse— Well, that's all we're talking about is sage grouse. Right. I mean, that was—let me break this down into two things. You noted the sage grouse first. So, just before Judge noted, we found all the leks in the areas of the two watersheds that could possibly be offended. There are 15. All right. And did anybody look at, well, this is where the lek is. This is where we're going to do an exit project, an exit site to a project. We're going to use a pesticide or we're going to do a fire or whatever in this area. So, the likely result of doing this fire in this area is that there's going to be—it's going to affect a certain amount of these leks, you know, in the long run or in the short run, or why you think they're going to come back if they're affected. Well, mitigation measures are in place to protect the leks from ever being harmed in the first place. So, if you look at—and this is in our supplemental excerpts of records—we talk about we want to reestablish the mosaic pattern. Now, we also say that's at 137. We also, on the same page, say that we're not going to allow treatment within four miles of active leks during March 1st to July 15th. That's the breeding season when the males do their ritual—their not ritual, but dance to attract the females. It's also the period when there's breeding and nesting going on. There's also a prohibition on applying vegetative treatments to more than 20 percent of the sage-grouse breeding habitat within a 30-year period. That's about the time it takes sage-grouses to recover. That's also found in our SCR at 137. Scrap fire, if we use that, will require that boundaries first be set to avoid sage-grouse breeding habitat. So, I'm sorry, that's at 148 in our SCR. So, they know where the leks are, they've got them in, nobody's saying they don't. And then they've got— I'm glad you haven't used the term sage-grouse because there's an X-Lex, right? It's everything you need to get them out of trouble. I'm sorry, ma'am, that's the first of it. I said the size of the leks. Yes. My understanding is that this project is going to cut back on the sage, which is what the grouse eat, particularly during the winter, and then hopefully bring it back. But first, it's going to cut back on it. That's correct. But, of course, it would only cut back where there's a problem with the sage-grouse. They're not just going to tear it up to tear it off. So, it's not at least an unhealthy dying sagebrush that's being treated, or it's a healthy sagebrush? It's not a healthy sagebrush. Most of the area is at risk for fire, and there's a problem with both vegetative invasion of these invasive weeds, and then there's a problem from past fire suppression that you've got too many trees, which block the sun from allowing these open areas that the sage-grouse need to live in as well as breathe. And so, but if you've got an area which is non-contaminated with invasive weeds, does it have the fire risk? There's no reason for that. And then there's this monitoring issue. I mean, since the other project said that there would be monitoring, and the RMP says that you have to, it would seem to have the cumulative analysis, you'd have to know what was actually going on in the other projects, but we don't know. You don't know, but what happened? But why don't we know? I understand that there was a statement, I mean, the guess was enough that it was going to be particularly improved for five years, but why don't you look in the meanwhile? You're arguing simply that Congress didn't give BLM enough to get into the monitoring. I mean, these two watersheds together, I believe, are about half a million acres, and- It would seem that they would be useful for two reasons. I mean, one is, in the two existing projects, one is because they go into cumulative analysis, and two, they would tell you something about whether your projections have an equal enemy, i.e. if after, I don't know how far into those projects you are, but it would be several years into them, or four years into them. Four years, yes. Right, and it was supposed to start getting better after five years, so you would think after four years, as your opponent said, you might be able to look and see whether anything was beginning to come back to the WW. Yes, you might be able to get some information, but I don't think that the failure to monitor in one project changed the analysis of the other. As I said, it's for two reasons. One is because the cumulative, but the other is to test your premises. Yes, I mean, what we're looking at here with their argument is a cumulative impacts argument. Yes, in part, but also, you're working on a bit of, my understanding is that the actual techniques used were basically the same, so you could go see whether an X technique actually led to something that looked like it was coming back or not. You didn't do it. The techniques as described in the decision documents are fine, I'm sorry, are the same, rather, but let me just, that's another thing I wanted to mention. It doesn't mean that the agency has to follow all the techniques identified, and even the decision document here, they can choose a subset if they see that things aren't working. What about this question you asked about that standards have changed? Does that mean that new standards will be reused in this project under the old standards? My understanding is that new standards would have to be. Mr. Greif, old standards have changed? Yes. He has been? Peered, yes. And so, his position is you've already locked yourself into the old standards, is that not right? The project was approved under the old standards. I mean, this was another issue that was never argued in the briefs, so we don't have anything in there addressing it. And if the court wants more specific information, I can get it. I can't, you know, really argue the briefs in response to the briefs that I've seen before. Similarly, all the business about whatever science was in the warranted but precluded listing, we were the only ones who mentioned that in a flip note. The plaintiff's appellate never raised an argument on that so-called science. So, I kind of had a loss here today to respond to it, since he wasn't in any either of the briefs we brought it up. But the project is going forward at a somewhat, I mean, it's not going forward very quickly, but this is hard work. I think one thing the science does say is that this is not miracle growth. If you take this stuff out and use it right away, you're going to see it's not literally complete dust. You're going to see a fairly barren area that takes many years to- I'm talking about the Lincoln County and Spring Valley projects and the failure to monitor them, despite the fact that they say that they're supposed to be annual monitoring and despite the fact that the RPM says they're supposed to be on-site or site-specific studies. Why is that a problem? And you never discuss any of that, meaning you don't even mention these projects? We don't mention them by name. There's not a requirement that we mention them by name. There is a discussion of which they agree we got the cumulative impacts area correct. But they say, well, we should have talked specifically about Lincoln and Spring Lake. And they never mention them in their comments. They mention cumulative impacts. But anyhow, you just mentioned that over 6,000 acres have been subject to vegetation treatments in the past in the EA. And I believe that's- In the EA. So that's like, the age in the EA is- So the question that we're talking about is how can you decide what the cumulative impact is when you have these projects that are four years into them, and you didn't look at what was going on there? Because what they did know, and you see this on the Spring Valley EA, is that for the first five years, you're really just monitoring not to see if there's any sagebrush coming back, but to see if the cheatgrass was effectively destroyed. But you don't do that either? No, they don't have that information. So you have no idea whether what you're doing, I mean, it's the same techniques, the same basic area. And so how can you do the cumulative impacts when you don't know whether- How do you get cumulative impacts? And how can you know whether, or you don't have a data gap as to what you're guessing is going to happen on this project? Because, again, they were relying on a lot of work that you've done on what methods should be used that will get rid of the cheatgrass, and that's in the programmatic- But all of those work say, and it's really important to go look at the particular areas and monitor them, but that's what you're not doing. They do, but they also provide mitigation measures, which I would say weren't followed for the two small projects. Are those projects discussed in the EA? Not by me. But is it your contention, you started to talk a moment about it under 4.14, where they talked about past actions? Yes. Is that a reference, in your view, to those other projects? It talks about fuel treatments have been completed approximately 6,804 acres, and it talks about biomechanical removal, thinning of pinion pine and juniper. In your view, do those refer to the other projects? They do. Here's the difficulty about completely- So, the fact that there are two ways to describe what's going to happen. You can take the total area, or you can address only the area being treated, and we don't have- Only the area being treated is what Sweet County can do for Spring Valley, and it's smaller than the total area, not surprisingly. So, I believe, and yes, that 6,700 acre reference is the prior treatments. They certainly are smaller, and they aren't big enough to have done much good. I think one last question. Can you tell me what exactly in the EA you're relying on is adequate cumulative impact discussion? The actual, the part that's head-to-head, cumulative impact doesn't seem much at all right. Well, I think it says enough. I think it says that the past two projects have been mentioned. The Hamlin project, at that point, was an extremely early point, and I would note that we do it in our briefs. This court has recognized that even where a project is reasonably foreseeable, and I'm I think either way, the Hamlin, at the time that we filed our brief, it was 2012, a scoping notice had gone out, and a couple of public meetings have been held. But the Hamlin project, at least, is mentioned in the EA. It is mentioned in one place in the EA, yes. Under reasonably foreseeable future actions. Yes. It just doesn't say much about it. It doesn't say much, because there wasn't, at that point, scoping is very early. The agency is supposed to get all sorts of public comment, and comment from the local government, and then it may change the project quite a bit based on these comments. You're very much supposed to consider them. If it doesn't, if it doesn't consider it, changing it in response to the comments is violating the agreement. Thank you, Your Honor. I'd like to pick up on what you just said, which is in the EA description of the fuel treatment projects. The prior Lincoln and Spring Valley projects were not fuel treatment projects. They were sage-grouse habitat improvement projects. Lincoln County was 10,000 acres, of which 9,000 acres was treated. And South Spring Valley was 4,000 acres, of which 3,100 acres were treated. 12,000 acres were treated, but not even discussed or mentioned in the EA. You can find those figures in the district court's opinion, and they're reflected in the record. So these sage-grouse improvement projects aren't even mentioned in the EA, much less articulated as to what their impacts may be for what it means for the sage-grouse in that entire area. Again, it's priority habitat, which means it's the most important to preserve. And when Shajiman, you asked him, is this unhealthy sagebrush? He said, yes, it's not correct. This is not unhealthy sagebrush. This is sagebrush that has been there for a long time. They call it decadent and even-aged. But for instance, they're going to use the tapu thaiuron, the herbicide. And this is at page 147 of the supplemental excerpts of the record. It's from the EA, page 28, where they're going to spray this poison where there's older, decadent, even-aged strands of sagebrush with desirable understory. Sagebrush with desirable understory is what sage-grouse need to survive. The sagebrush protects them as they're raising their young. They eat the insects and the forbs and the grasses. Desirable understory is what you want. They're going to go out and spray poisons on the desirable habitat for sage-grouse in the hope. Very limited part. I mean, the district court talks about how extremely limited that was. And the herbicide was only being used in one part of one unit of 15 treatment units. So it's a very narrow use of the herbicide. I think it's still a fairly large, instead of like 1,000 acres or more. And I understand what you're saying, Trish. But when you look at all of the treatments together, it still adds up to about 30,000 acres of sagebrush treatments. Not just the herbicide, but everything else under this. Even under the district court's analysis, there's still 30,000 acres. Did you follow the district court's analysis? Or is the analysis correct? The description of the project and what it contained? In this case, my co-counsel had an emergency and I had to step in two days ago. And I don't know the answer to that. So what I'm saying is even under the district court's analysis, there's still extensive sagebrush treatment. Under the district court's analysis, there's still 30,000 acres, which is about 45, 49 square miles of sagebrush that will be destroyed. And that's in priority. Sagebrush habitat, when everything says save those habitats, don't go out and destroy them in the hope that will help. Sorry? It would be helpful to me if, in conclusion, you could, in three or four sentences, tell us what the core of your challenge is. What are the most important things that are in CRM 17? The most important thing for all of the sagebrush treatment is the- Now, what's the sagebrush treatment? Why the EA is inadequate? Because it didn't address the cumulative effects of all of the things that they've done out there, including the exact same thing. Well, I'm sorry, that's not going to help. I mean, specifically, what should be in there that isn't in there? Well, you should- What should they have done in the community? What should they have collected that didn't collect? Or what should they have reported that didn't report? For instance, if you read the EA, where did these other projects happen? You can't find that at all. They should at least be moving in and analyzing it. But it's a mystery, so that's not very helpful. We know where they have it at. And I would ask that they follow the protocols that are laid out by the scientists like the Fish and Wildlife Service. Again, you read that 2010 margin of preclusion, it says the first thing you do is you identify the populations and their trends. There's nothing about sagebrush populations and their trends here at all. They found the leks. The leks are areas where they breed and display, but it's the areas around there where they raise their young and where sage-grouse reproduction really happens. There's very little description of that. And what will this do to the interconnectivity? Connectivity between sage-grouse is another critical thing. It's not mentioned here at all. They have these two valleys with others around them where the sage-grouse go back and forth, taking out these parts of sagebrush here and there. What does that mean for connectivity? Not analyzed. That's the kind of tricky hard look that NEPA requires. And I would like to just mention the Ninth Circuit issue decision. The Great Basin Resource Watch is December 2016 from the Ninth Circuit, 8-44-1095. It's another cumulative impacts case about the importance of having accurate information in your baseline in order to study cumulative impacts. We weren't able to brief it because this case came down in December. Obviously, the On the Versus Jewel case that you authored is squarely on point, too, about the importance of having baseline information first that they don't have. If the briefs were there, the briefs would not have had the problem of baseline information. They would have understood the cumulative impacts. It's important for baseline because you can't assess cumulative impacts. They're saying we put it all together in an aggregate. And if you don't have the detailed information to know what that aggregate means, that is your baseline now. So you can assess what it means in the future. That's why it's relevant. Thank you.
judges: Reinhardt, Berzon, Amon